Victor SOTO and John R. Seybert,
Plaintiffs,

v.

INTERNATIONAL ORGANIZATION OF MASTERS, MATES AND PILOTS, AFL/CIO and the Offshore Membership Group, Defendants.

No. 78 Civ. 5300–CLB.

United States District Court,
S. D. New York.

Feb. 28, 1979.

John R. Seybert, Seybert & Seybert, Woodbury, N. Y., for plaintiffs.

Seymour M. Waldman, Waldman & Waldman, Burton M. Epstein, New York City, for defendants.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

By their complaint filed November 6, 1978, plaintiffs, members of the International Organization of Masters, Mates and Pilots (hereinafter "MM&P" or sometimes the "union"), seek to enjoin their organization, which is the defendant in this action, from implementing the results of a referendum among the Offshore Membership Group, described below and alleged to have

been carried out in violation of their rights and those of rank and file members, protected by the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411.

Subject matter jurisdiction is founded upon 29 U.S.C. § 412. Venue is proper in the Southern District of New York.

By motion docketed November 27, 1978, plaintiffs sought preliminary injunctive relief. The motion for the preliminary injunction was consolidated with the trial of the merits, pursuant to Rule 65(a)(2), F.R. Civ.P. and the case tried before the Court without a jury on December 19, 21, 22 and 27, 1978. The briefs of the parties have been received and considered. Familiarity with the stipulated facts docketed December 26, 1978 is assumed.

The MM&P is a labor organization and collective bargaining representative for licensed deck officers aboard ocean-going vessels, licensed pilots in major ports, and licensed personnel aboard smaller commercial vessels operating in harbors and inland waterways.

The challenged referendum was conducted by mail among the 4,910 members in good standing who are engaged as licensed deck officers in the American Merchant Marine, who are referred to collectively herein as the "Offshore Group."

Collective bargaining negotiations with various shipping companies during the spring and early summer of 1978 resulted in a proposed contract for the years 1978–1981. This contract was unanimously approved for ratification by the Offshore Membership Group Negotiating Committee at its meeting in Baltimore on June 24, and 25, 1978. This committee had been nominated or recommended by the Offshore Advisory Council and selected by the General Executive Board of the MM&P pursuant to its Constitution. Negotiations with other shipping companies continued after the contract model had been developed. The last of the major employers to accept did not do so until September 29, 1978.

The two propositions which plaintiffs seek to have enjoined were numbered I and IV respectively on the referendum ballot. Objections to Proposition II have been withdrawn. Proposition III was defeated.

Proposition I provided for approval and ratification of the 1978–1981 collective bargaining agreement. Proposition IV provided for a substantial increase in the pay of offshore division union officers and elected representatives, effected by adoption of a formula making their wages equivalent to thirty times the daily vacation wage of seagoing officers in accordance with the work classifications set forth in a table which appeared within the body of Proposition IV, as submitted on the ballot. This latter proposition was added to the referendum ballot after its adoption by the General Executive Board of the MM&P at a meeting on August 24 and 25, 1978.

Since a significant percentage of the membership is at sea at any given time, voting within the Offshore Group is conducted by mail referendum. At the time of this referendum, 1,875 members of the Offshore Group were at sea aboard 375 different ships.

Referendum ballots were mailed by the American Arbitration Association on October 6, 1978. This organization was under contract with MM&P to administer the voting in an impartial manner.

As was its customary practice, the Association mailed the ballots from New York to the last known address (or permanent home address) designated on the union records by each MM&P member. Members were provided with a ballot, a copy of the proposed collective bargaining agreement, and a return mailing envelope. A period of sixty (60) days was allowed within which the members could execute and return the ballots to the American Arbitration Association.

Each of the two challenged propositions received a favorable vote from the membership. Proposition I was passed by a margin of 1,933 to 1,025, with a total vote of 2,958, or 60.2% of the eligible membership. Proposition IV passed by a margin of 103 votes, the count being 1,526 for and 1,423 against.

The individual plaintiffs Seybert and Soto are and have been active in the political affairs of the MM&P. They had ample opportunity to cast their own votes, and to oppose the provisions of the new agreement. By the new agreement, sweeping but lawful changes are effected in the seniority system of the union. In this action, plaintiffs do not assert that they personally were aggrieved, disenfranchised by what took place, or misled by the form of the ballot. Rather, they challenge the results of the October 6, 1978 referendum in the claimed right of members of the rank and file of the union said to have been disenfranchised by what plaintiffs assert is an unreasonably short period of time in which members serving at sea could vote in the referendum. Plaintiffs also claim that members opposed to passage of the referendum were denied fair access to express their opposition in the union newspaper, because of its irregular publication, and were silenced at union meetings. They also assert that Proposition IV was misleading in that it did not disclose that shorebound union officials would receive non-watch standing pay and cost of living increases within the "base pay" figure from which their pension benefits would be calculated, thereby in actuality receiving compensation in the form of fringe and pension benefits larger than members serving at sea in the comparable capacities stated on the ballot.

For each of these reasons, plaintiffs assert that the general due process requirements of 29 U.S.C. § 411 have been violated. This statute provides in relevant part:

"(a)(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

I find that the procedures followed by the union in conducting this referendum through the American Arbitration Associa-

tion were adequate to permit a fair opportunity to vote for all Offshore Members, including plaintiffs and those at sea. Plaintiffs have failed to prove that the sixty (60) day referendum period was an unreasonably short period of time in which to vote. A prior referendum was conducted by the union in 1973 in which members were given only forty-five (45) days to cast their ballots. This referendum produced the largest voter turnout (4,212) in the union's history. (Stip. Fact # 8).

Any union member had the privilege and opportunity to telegraph or write to the American Arbitration Association requesting that a ballot be sent to him at a place other than his permanent home address as shown on union records. This would include mailing to a port agent in another port, to the shipshusband in foreign lands, where the member's vessel was expected to call, or to any other place. Nothing prevented the union member from directing those family members or other persons receiving his mail at his fixed place of abode, to send the ballot to a place where the member's ship would call during the 60 day period.

Deck officers on most vessels have access to radio, and working conditions have changed so much since the days of Dana, that it is seldom an American vessel is at sea and out of communication with land for a period of 60 days. It is contended in behalf of plaintiffs that wilfully intending to shorten the voting time, the union leadership turned the ballot over to the American Arbitration Association at a time when it appeared likely, as turned out to be the case, that the ballots would be placed in the mail on a Friday before the long Columbus Day holiday weekend, a time during which postal service would be delayed by at least one day. I find no proof in the record that there was any such undisclosed intention on the part of union officials or the American Arbitration Association. The timing of the mailing by the American Arbitration Association is explained by the sequence of events leading up to the submission. I find that the defendants and the Association acted with due diligence in placing the materials in the mail prior to a holiday and did

not intend thereby to deprive any member of the union of his voting rights.

The present union Constitution, adopted after much intra-organization turmoil and litigation in the federal courts, contains an express provision [Article V, Section 9(f)] calling for a ninety (90) day period during which ballots must be circulated for the election of officers.

Article I, Section 2 of the Constitution contemplates that "the authority and power of this Organization is vested in the members thereof acting directly in membership meetings and *referenda*, and by and through their duly elected delegates, meeting in convention assembled." (Emphasis added). Article III, Section 4 provides that the ballot of any member shall be counted if he is not suspended for non-payment of dues when the ballots are mailed or when they are counted. Article IV, Section 2 requires not less than four months notice prior to the date of a convention. Under Section 6 of that Article, all proposed resolutions must be forwarded to the International Secretary-Treasurer at least 30 days prior to the opening day of the convention. Section 7 provides that a special convention may be called on 30 days written notice by a two-thirds majority vote of the General Executive Board. Article V, Section 1 provides for 15 days notice of election. Article X, Section 1(b) provides for a 45 day referendum when an emergency assessment is proposed to be levied on the members. Article XI, entitled "Other Matters" contains a reference in Section 6 to balloting. This provision is simplicity itself, it reads as follows:

> "Section 6. Balloting. All referenda shall be conducted by a Membership Ballot Committee. The ballots and all records pertaining to elections or referenda must be preserved for one year."

Those who drafted the Constitution knew that members would be at sea, and this fact would affect receipt of ballots. Because the Constitution is so specific in fixing times for some matters, such as election of officers, it is significant that there is silence on the length of time during which ballots must be circulated with respect to a referendum. This omission to provide a fixed time period for referenda, while so providing for the election of officers and other matters, appears intentional. The members who ratified the union Constitution must be taken to have understood that the election of officers is seldom a pressing matter, that an emergency assessment may be pressing, and that a general referendum, particularly where ratification of a collective bargaining agreement is concerned, may require prompt resolution, so that the length of time had best be left to the leadership for discretionary determination. Often a union contract is negotiated under tensions, where job actions or strikes are threatened or actually occur. When collective bargaining has resulted in agreement, it is essential, both to employers and union members that there be a prompt decision whether or not the contract is to be accepted by the rank and file, and become effective. The Court regards the omission to provide in the union Constitution for a fixed period of time within which such referenda must be submitted to the membership as evidencing the intention of the framers that a reasonable time, not necessarily as long as ninety (90) days should be allowed.

I find that in this case a reasonable time was fixed, and that there is nothing inherent in a 60 day referendum period which would prevent Offshore Members from making reasoned decisions concerning the referendum and to express those decisions by voting.

Although a significant segment of the Offshore Group was at sea at the time the referendum was mailed, the average voyage for such members is only 38 days.

Plaintiff Soto admitted that he participated in a mailing of opposition literature to some 375 ships at sea having Offshore Members aboard. This contradicts any assertion by plaintiffs that ballots could not reach substantially all of those members at sea, and I find that any such member having a strong desire to vote could have done so.

Plaintiffs' objection that the union newspaper was not being published on a fixed

publication date, as was required under the MM&P Constitution raises a valid point. Article XI, Section 5(a) thereof provides that "[T]he official publication shall be published on a regular basis with a fixed publication date."

The same constitutional provision expressly grants to every member

"the right to fair and reasonable access to the official publication for presentation of a point of view for or against proposed amendments to this Constitution submitted by referendum, or any other matters of general membership interest, subject to reasonable rules adopted by the General Executive Board."

Plaintiffs' claim under this provision is actionable here under principles of pendent jurisdiction, and probably also actionable under the LMRDA.

The evidence adduced at trial revealed that the newspaper was being distributed about once every two months in what could be described as an irregular fashion, and that there had not been compliance with the constitutional requirement of a fixed publication date. An issue of the newspaper had been distributed to the membership in June, another in late August and one in late October.

▮▮▮ Plaintiffs could have sought injunctive relief from this Court at the beginning of the referendum period, or prior thereto. While there is no question that the plaintiffs are entitled to have a fixed publication date adopted and adhered to, this Court is satisfied on the entire record in this case that the failure to publish regularly did not taint the results of this particular referendum to such an extent as to require that the issues be resubmitted to the membership for a new vote. It does not appear that it was the intention of the constitutional provision relating to fixed publication dates that the union leadership be prohibited from publishing an "extra" edition of the paper, when and if there was a matter of great significance to be communicated to the membership. The function of such a house organ is primarily to communicate to the members news and views

of importance to them in their work and in connection with the operation of the organization itself. Defendant's Secretary-Treasurer, Lloyd Martin, testified that the union had had various difficulties with the management of the newspaper, resulting in large part due to the defenestration of an editor. This editor apparently had adhered to fixed publication dates prior to his death, but there is no showing that the fixed dates had been formally adopted, as required by the Constitution. New editors of the newspaper appointed thereafter, including such notable persons as a former editor of the National Roller Derby Manual, had turned out to be unable to adhere to precise publication dates. The Court is not impressed with the validity of these contentions, and believes that the union leadership, if so minded, could have established fixed dates for publication, notified the members of such dates, and adhered reasonably to the dates. The purpose of this provision is to ensure fair access, and persons on the outside of any ruling union clique cannot be expected to achieve meaningful expression of their views unless they know when the paper goes to press. However, as noted above, plaintiffs were not prejudiced by the failure of the union to publish its newspaper on fixed dates. They had acquiesced in that failure.

Furthermore, plaintiffs did not attempt to publish opposing viewpoints in the October issue. See *Sheldon v. O'Callaghan*, 497 F.2d 1276 (2d Cir. 1974). Instead, plaintiffs chose to and did conduct a private mailing campaign in the form of flyers voicing opposition to the adoption of the proposed contract and other annexed propositions. They did not attempt to obtain the aid of the union in any respect as regards this mailing. Of passing significance is the fact that they and others were successful in defeating Proposition III, also supported by the officials of the union.

Unsupported by the evidence adduced at trial were plaintiffs' allegations that they had been denied the right to voice their opinions at union meetings. These allegations are apparently based on a confrontation between plaintiff Soto and union President Lowen at a meeting in August at the

Port of New York. At that time, a report on the proposed contract was being presented by Captain Lowen. Mr. Soto rose to object to what he characterized as "rhetoric." When he was ruled out of order by New York Port Agent Henri Nereaux, he attempted unsuccessfully to lead the members present from the meeting room. Mr. Soto returned later to the meeting room, but he admits to paying no particular attention to the questions asked of the President after the presentation, and he left prior to the conclusion of the meeting.

■ I find that Soto was not denied the right to voice his opinion at the August meeting which took place in the Port of New York. He was merely denied the opportunity to interrupt the President during his presentation. A union has the right to conduct a meeting in accordance with the generally accepted rules of order, which limit interruptions. An ample opportunity was provided for questions and answers following Captain Lowen's presentation, and, as Port Agent Nereaux testified, many of the questioners expressed opposition to the proposed contract.

The meeting at the Port of New York was just one of a number of presentations conducted by various union officers in an effort to inform members of the contents of the new collective bargaining agreement, and secure its passage. Such meetings took place at Houston, Wilmington, San Francisco and New Orleans, at each of which union officials explained the new contract provisions, and made themselves available for questioning.

■ There was nothing improper about this procedure. Union leaders are elected to lead. They have the right and duty to negotiate with employer groups in behalf of the union to achieve what they regard as the best possible contract, and to support its ratification by the rank and file. Failure to do so on their part would dilute the effectiveness of the union as a collective bargaining agent, and frustrate the purpose of the statute. So long as they do so fairly, the union leaders are within their rights urging ratification, and I find that they acted within the bounds of generally accepted conduct in like matters. The remedy of those union members dissatisfied with the practice followed, opposed to the contract itself or displeased with the activities of the union officers in urging its passing, is the same remedy granted to any electorate. They can always vote to throw the incumbents out at the next election.

■ Plaintiffs remaining contentions have to do with Proposition IV on the ballot, granting a pay increase to Offshore elected officers and representatives. They assert that this proposition was added with no advance notice to the Offshore Group before its appearance in the October 6th referendum. Furthermore, they claim that 60 days was too short a period of time in which to judge the necessity for this wage increase, especially in light of the fact that the proposition was framed in terms of certain pay rates contained within the collective bargaining agreement which was the subject of the same referendum.

Proposition IV was added to the referendum after its adoption by the General Executive Board of the MM&P on August 25, 1978. It remained unpublicized until its inclusion on the October 6th referendum ballot. I find that the 60 day referendum period was adequate in order for members to make a considered decision on Proposition IV.

It is true that the format of Proposition IV was somewhat misleading. Its phrasing is somewhat arcane to the uninitiated. It is not readily discernible from the Proposition that in effect the shorebound elected officers and representatives had cut themselves a slightly larger piece of cake than had been set aside for the members holding what the Proposition refers to as equivalent positions of responsibility at sea.

■ A certain amount of political trickiness in the phrasing of propositions is permissible. The purpose of the statute was to grant the union members the same rights and privileges within the organization as are traditional in local government and in the numerous voluntary social, fraternal and political groups which operate within the nation according to the general rubric of Roberts' Rules of Order. It is significant

that the membership of this labor organization are highly skilled, well-educated professionals. The record shows that at least 75% of the members are college graduates. All members are licensed by the United States Coast Guard as a result of examinations more arduous than those to which lawyers and physicians are subjected. Members' responsibilities include the command and navigation of vessels at sea under all kinds of weather conditions where they have sole responsibility for the safety of the ship and crew. Such persons have the intelligence to ascertain, merely from a reading of Proposition IV, that the elected representatives would receive more in fringe and pension benefits, and were not, in the words of the Proposition, "directly tied" to the wages set forth in the Master Offshore Collective Bargaining Agreement. The omission to disclose, found within the body of Proposition IV is not material, and does not rise to such a level as to represent a violation of 29 U.S.C. § 411(a)(1). Plaintiffs' remedy is political. If a majority of the union membership is not satisfied with the compensation of the elected officers and representatives, it may make its wishes known in the next election held for such positions. It must be noted that compensation of union officials is an issue upon which reasonable persons may differ. Presumably, by paying more, this union will get better leadership and service. The wages of most union leaders greatly exceed those paid to their members and those paid by MM&P. The International President of the Teamsters Union received compensation and fringe benefits valued in excess of $169,000.00 in 1977.

In summary, in all respects save one, plaintiffs have failed to prove by a preponderance of the credible evidence any denial of rights under 29 U.S.C. § 411 or under their Constitution. Upon the facts presented, it must be concluded that the union acted in conformity with the law in the administration of its referendum of October 6, 1978. Plaintiffs were not denied access to the union membership in any manner. They voiced their dissent freely. Members of the Offshore Group were provided with adequate time to consider the referendum and cast informed votes. The procedures followed by the American Arbitration Association on behalf of the union were such "reasonable rules and regulations" as were envisioned by the relevant provisions of the LMRDA.

Plaintiffs' application for injunctive and declaratory relief is denied in all respects except that plaintiffs are entitled to a mandatory injunction requiring defendants, within a reasonable period of time to be set forth therein, to establish and announce the fixed publication dates for the publication known as the "Master, Mate & Pilot" as required by Article XI, Section 5(a) of the Union Constitution.

Settle a final Judgment on notice.